**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Misc. Case No. 1:22-mc-20194**

| | |
|---|---|
| GRANT HOUSE, SEDONA PRINCE, AND TYMIR OLIVER, | |
| *Petitioners,* | |
| v. | CASE IN OTHER COURT: *In re Student Athlete NIL Litigation,* Case No. 4:20-cv-03919-CW (N.D. Cal.) |
| UNIVERSITY OF MIAMI, | |
| *Respondent.* | |

**PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH A RULE 45 SUBPOENA, OR, IN THE ALTERNATIVE, TO TRANSFER THE MOTION**

## <u>Table of Contents</u>

I.     BACKGROUND ................................................................................................. 2

     A.    The Underlying Litigation................................................................... 2

     B.    The Subpoena................................................................................... 4

II.    ARGUMENT ...................................................................................................... 5

     A.    Legal Standard .................................................................................. 5

     B.    The Subpoenaed Documents Are Relevant and Necessary to the Litigation .......... 6

          i.    NIL Agreements or Data.......................................................... 6

          ii.   Squad Lists............................................................................ 10

          iii.  Financial Aid Summary Reports................................................ 13

          iv.  Athletics Commercial Agreements ............................................ 14

III.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER PLAINTIFFS'
     MOTION TO THE NORTHERN DISTRICT OF CALIFORNIA............................... 16

     A.    Plaintiffs' Motion Should Be Adjudicated in the Northern District of California,
          Which Has the Best Understanding of the Complex Issues Involved in This Action
          .................................................................................................. 17

     B.    The Northern District of California Should Rule on Similar Motions................. 18

     C.    Transferring This Motion Would Impose No Burden on Miami......................... 19

IV.   CONCLUSION.................................................................................................. 20

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*ADP, LLC v. Ultimate Software Grp., Inc.*,
No. 17–cv–61272–DMM, 2017 WL 7794274 (S.D. Fla. July 26, 2017).............................. 6

*In re Braden*,
344 F. Supp. 3d 83 (D.D.C. 2018)................................................................................... 18

*Chem-Aqua, Inc. v. Nalco Co.*,
No. 3:14–mc–71–D–BN, 2014 WL 2645999 (N.D. Tex. June 13, 2014)........................... 20

*In re Coll. Athlete NIL Litig.*,
No. 4:20-cv-03919-CW (N.D. Cal.)............................................................................3, 17

*Cont'l Auto. Sys. U.S., Inc. v. Omron Auto. Elecs., Inc.*,
No. 14 C 3731, 2014 WL 2808984 (N.D. Ill. June 20, 2014) ........................................... 18

*Dig. Shape Techs., Inc. v. Glassdoor, Inc.*,
No. 16–mc–80150-JSC, 2016 WL 5930275 (N.D. Cal. Oct. 12, 2016).............................. 11

*Exist, Inc. v. Shoreline Wear, Inc.*,
No. 15–61917–mc, 2015 WL 13694080 (S.D. Fla. Oct. 16, 2015) ...............................18, 20

*Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*,
No. 21–81824–mc, 2021 WL 4891300 (S.D. Fla. Oct. 19, 2021)........................................ 6

*Global Music Rights, LLC v. Saga Commc'ns, Inc.*,
No. 1:21–MC–00063-JPC, 2021 WL 4751184 (N.D. Ohio Oct. 8, 2021)........................... 18

*Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*,
No. 09–60029–Civ., 2010 WL 9871643 (S.D. Fla. Jan. 26, 2010)..................................... 11

*Google, Inc. v. Digital Citizens All.*,
No. 15–mc–00707-JEB-DAR, 2015 WL 4930979 (D.D.C. July 31, 2015)........................ 19

*Hoog v. PetroQuest, LLC*,
338 F.R.D. 515 (S.D. Fla. 2021)..................................................................................17, 18

*N. Am. Transp. Servs., LLC v. Ryder Truck Rental, Inc.*,
No. 21–mc–21911, 2021 WL 3290627 (S.D. Fla. Aug. 2, 2021).......................... 5, 6, 10, 11

*In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*,
Case No. 4:14-md-2541-CW (N.D. Cal.)........................................................................... 9

*Nat'l Collegiate Athletic Ass'n v. Alston,*
    141 S. Ct. 2141 (2021)............................................................................12, 13

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.,*
    311 F.R.D. 532 (N.D. Cal. 2015)................................................................ 13

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.,*
    958 F.3d 1239 (9th Cir. 2020), *aff'd,* 141 S. Ct. 2141 (2021)................................ 7

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
    No. 09–cv–01967-CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013)................................ 12

*In re Niaspan Antitrust Litig.,*
    No. 15–cv–1208-JKB, 2015 WL 3407543 (D. Md. May 26, 2015)................................ 19

*Sullivan v. Personalized Media Commc'ns, LLC,*
    No. 16–mc–80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016)................................ 6

*The Dispatch Printing Co. v. Zuckerman,*
    No. 16–cv–80037, 2016 WL 335753 (S.D. Fla. Jan. 27, 2016)................................19, 20

*TIC Park Ctr. 9, LLC v. Cabot,*
    No. 16–cv–24569, 2017 WL 3099317 (S.D. Fla. Apr. 12, 2017)................................ 10

*VirnetX, Inc. v. Apple Inc.,*
    No. 13–mc–80769, 2013 WL 12108440 (S.D. Fla. Sept. 26, 2013), *report and recommendation adopted,* 2013 WL 12108441 (S.D. Fla. Nov. 18, 2013)................................ 19

*Walgreen Co. v. Wyeth, Inc.,*
    No. 19–mc–60417, 2019 WL 2406338 (S.D. Fla. Mar. 26, 2019)................................17, 18

*Wultz v. Bank of China, Ltd.,*
    304 F.R.D. 38 (D.D.C. 2014)................................................................ 20

*In re Zantac (Ranitidine) Prods. Liab. Litig.,*
    No. 20–md–2924, 2020 WL 5585137 (S.D. Fla. Sept. 16, 2020)................................ 6

**Statutes**

20 U.S.C. § 1232g, CFR Part 99................................................................*passim*

**Other Authorities**

@CanesFootball, TWITTER (June 30, 2021, 7:15 PM),
    https://twitter.com/canesfootball/status/ 141037660143977676 ................................ 8

*All Hurricanes Scholarship Football Players*, CBS SPORTS (July 7, 2021),
    https://www.cbssports.com/college-football/news/miami-booster-offers-
    540000-nil-endorsement-deal-to-all-hurricanes-scholarship-football-players/...................... 3

Brian Geisinger, *Miami Football Players Set to Earn Money with NIL Deal,*
*American Top Team* (July 6, 2021), https://accsports.com/acc-news/miami-
football-american-top-team/; ........................................................................................ 2

ESPN (Jan. 8, 2015), https://www.espn.com/college-
sports/story/_/id/12135717/miami-hurricanes-adidas-strike-12-year-
merchandise-marketing-agreement ............................................................................... 4

Fed. R. Civ. P. 26(b) .......................................................................................................... 6

Fed. R. Civ. P. 34 ..........................................................................................................1, 6

Fed. R. Civ. P. 37 .............................................................................................................. 1

Fed. R. Civ. P. 45 .....................................................................................................*passim*

Loc. R. 26.1(g) ................................................................................................................... 1

*Miami Athletics Launches Ignite Name, Image & Likeness Program* (June 30,
2021), https://miamihurricanes.com/news/2021/06/30/miami-athletics-
launches-ignite-name-image-likeness-program-2/ ...................................................... 4

Michelle Kaufman, *University of Miami basketball players offered $6,000 NIL*
*contracts with Yummy Crypto*, MIAMI HERALD (July 24, 2021) ............................... 2

NCAA Division I Manual, *available at* https://www.ncaapublications.com/p-
4605-2020-2021-ncaa-division-i-manual.aspx ........................................................ 10

*NIL Deals*, JUST WOMEN'S SPORTS (Oct. 12, 2021),
https://justwomenssports.com/female-athletes-who-have-cashed-in-on-nil-
deals/ ........................................................................................................................3, 4

*NIL Policies*, MIAMI HURRICANES, https://miamihurricanes.com/nil-booster-
policy ............................................................................................................................ 7

*Rules Fade Under Pressure*, NY TIMES (July 1, 2021),
https://www.nytimes.com/2021/07/01/sports/ncaafootball/ncaa-college-
athletes-endorsements.html ......................................................................................... 2

*UM Men's Basketball Team Offered Endorsement Deals By Charitable*
*Cryptocurrency Company*, SOUTH FLORIDA SUN SENTINEL (July 24, 2021),
https://www.sun-sentinel.com/sports/miami-hurricanes/fl-sp-miami-mens-
basketball-nil-deal-20210724-flevmsrgsbdvpcwxigieiqoxbi-story.html ..................... 3

What We Do, OPENDORSE, *available at* https://opendorse.com/about ......................... 8

In accordance with Rules 34, 37, and 45 of the Federal Rules of Civil Procedure and Rule 26.1(g) of the Local Rules of the Southern District of Florida, Petitioners Grant House, Sedona Prince, and Tymir Oliver ("Plaintiffs") hereby move to compel nonparty University of Miami to comply with a properly served subpoena seeking the production of documents, dated September 20, 2021, or, in the alternative, to transfer this Motion to the Northern District of California, where the underlying litigation is pending.

## MEMORANDUM OF LAW

Petitioners are college athletes asserting antitrust challenges to current and former National Collegiate Athletic Association ("NCAA") rules prohibiting them from benefiting financially from their names, images, or likenesses ("NIL"). On July 1, 2021, the NCAA suspended certain of these restrictions, allowing athletes to commercialize their NILs in limited circumstances. Since July, many college athletes, including Miami's entire football and men's basketball teams, have earned or been offered compensation through endorsement, sponsorship, or other NIL licensing deals.

Respondent Miami ("Miami"), while a nonparty to the litigation, is an NCAA member school and a party to, and beneficiary of, the challenged agreements to restrain trade. It is in possession of crucial discoverable information that cannot be obtained through other means. Miami has refused outright to engage in good-faith negotiations or to produce any information in response to Plaintiffs' subpoena, but Plaintiffs seek here to compel production of only four categories of documents: (1) documents or data relating to endorsement, sponsorship, or other NIL licensing agreements entered into by Miami athletes and disclosed to Miami under state law and university policy; (2) team "Squad Lists" that NCAA member schools are required to generate annually in accordance with NCAA rules; (3) corresponding financial aid summary reports; and (4) Miami's athletics-related media, sponsorship, and similar contracts. Plaintiffs limit their Motion to these categories because the responsive materials are readily identifiable, because they are highly relevant to Plaintiffs' claims, and because Plaintiffs have agreed through negotiations with many other NCAA member schools (including many of Miami's peer universities in the

Atlantic Coast Conference and other of the prestigious Power Five conferences) to limit their productions to these four categories.

There is no special reason why Miami should not make the same requested production. If anything, there are special reasons why Miami's records *should* be produced: Miami's athletics department reportedly generated $115 million in 2020,[1] largely because of the efforts of, and value derived from, its athletes.   And within days of the NCAA allowing college athletes to commercialize their NILs, scores of Miami's athletes were offered or entered into such agreements, including every member of Miami's football and men's basketball teams.[2]   These realities go to the heart of the underlying litigation, including Plaintiffs' damages calculations, class-certification requirements under the Federal Rules of Civil Procedure, and the continued popularity of college sports when the athlete participants are allowed to commercialize their NILs.

As described below, the requested information is proportional to the needs of the litigation. It is vital to Plaintiffs' ability to prove their claims, and production would impose no undue burden on Miami, which is a direct participant in, and beneficiary of, the challenged NCAA rules.

## I.    BACKGROUND

### A.    The Underlying Litigation

Plaintiffs filed the underlying federal antitrust class-action lawsuit against the NCAA and its five most prominent member conferences (the ACC, Big Ten, Big Twelve, Pac-12, and SEC), alleging that Defendants, together with their member schools, have agreed to adopt national rules and restrictions to limit college athletes' abilities to earn compensation in exchange for their NIL rights.  Miami has been a member of the ACC since 2004 and a member of the NCAA for decades.

---

[1] Alan Blinder, *College Athletes Cash In as Generations of Rules Fade Under Pressure*, NY TIMES (July 1, 2021), https://www.nytimes.com/2021/07/01/sports/ncaafootball/ncaa-college-athletes-endorsements.html.

[2] Brian Geisinger, *Miami Football Players Set to Earn Money with NIL Deal, American Top Team*, ACCSPORTS.COM (July 6, 2021), https://accsports.com/acc-news/miami-football-american-top-team/; Michelle Kaufman, *University of Miami basketball players offered $6,000 NIL contracts with Yummy Crypto*, MIAMI HERALD (July 24, 2021), https://www.miamiherald.com/sports/college/acc/university-of-miami/article252999658.html.

At class certification, Plaintiffs will seek to represent four putative injunctive-relief and damages classes and subclasses, consisting of current and former college athletes. *See* Consol. Am. Compl. ¶¶ 300–05, ECF No. 164[3] (attached as Ex. 1).

The NCAA's current bylaws, rules, and regulations prohibit Miami and all NCAA Division I ("D-I") schools from directly or indirectly providing compensation to college athletes in exchange for the athletes' NIL rights. *Id.* ¶ 23. For decades, NCAA rules also prohibited athletes from receiving NIL-related compensation from *any* source, including from third parties unaffiliated with NCAA member schools. *Id.* ¶¶ 97, 100–04. On July 1, 2021, the NCAA announced a temporary policy suspending some of its NIL rules and permitted athletes to receive compensation from third parties for their NILs and subject to several limitations. *Id.* ¶ 22.

The period since July 1 has proven to be a natural economic experiment. Thousands of athletes have seized the newly permissible NIL opportunities, demonstrating the immense demand for college athletes' NILs. Within days of the NCAA's temporary policy taking effect, every scholarship athlete on Miami's football team received an offer for an NIL payment of $500 per month.[4] Three weeks later, the entire men's basketball team was offered similar deals.[5] Miami's female athletes are also participating fully in licensing their NIL rights, entering NIL agreements worth many thousands of dollars.[6] Indeed, these NIL arrangements have regularly extended to

---

[3] Unless noted otherwise, docket citations refer to docket entries in *In re College Athlete NIL Litigation*, No. 4:20-md-03919-CW (N.D. Cal.).

[4] Ben Kercheval, *Miami Booster Offers $540,000 NIL Endorsement Deal to All Hurricanes Scholarship Football Players*, CBS SPORTS (July 7, 2021), https://www.cbssports.com/college-football/news/miami-booster-offers-540000-nil-endorsement-deal-to-all-hurricanes-scholarship-football-players/.

[5] Khobi Price, *UM Men's Basketball Team Offered Endorsement Deals By Charitable Cryptocurrency Company*, SOUTH FLORIDA SUN SENTINEL (July 24, 2021), https://www.sun-sentinel.com/sports/miami-hurricanes/fl-sp-miami-mens-basketball-nil-deal-20210724-flevmsrgsbdvpcwxigieiqoxbi-story.html.

[6] Sophie Chen, *Female Athletes Who Have Cashed In on NIL Deals*, JUST WOMEN'S SPORTS (Oct. 12, 2021), https://justwomenssports.com/female-athletes-who-have-cashed-in-on-nil-deals/.

sports beyond football and basketball.[7]  And Miami has boasted about its ability to enhance athletes' NIL-related earning potential, announcing on June 30 that Miami had launched its "Ignite" program to help athletes build and monetize their personal brands.[8]

Nonetheless, Miami was, and continues to be, a direct participant and beneficiary of the illegal restraints at issue.  As a five-time football and four-time baseball national champion, Miami is a pillar of big-time college sports.  The Miami Hurricanes play eighteen NCAA D-I sports, and Miami's athletic department earned more than $115 million in revenues last year.[9]  These revenues are directly attributable to the efforts of, and value derived from, Miami's athletes.  For example, Miami is currently party to a twelve-year deal with Adidas, reportedly worth nearly $100 million.[10] Under this deal, Miami receives millions of dollars annually in exchange for requiring its athletes to wear Adidas apparel during all competitions, and Adidas reaps the benefits of associating its products with Miami's athletes.  The athletes, however, earn nothing from the arrangement because NCAA rules continue to prohibit it.

### B.    The Subpoena

Plaintiffs served the subpoena (attached as Exhibit 2) on Miami on September 20, 2021, with thirteen relevant document requests.  Attached to the subpoena, Plaintiffs provided copies of the protective orders governing the production of confidential documents in the underlying litigation—orders that have protected some of the most highly confidential and valuable commercial agreements in college sports.  *See* Ex. 2 at Attachment B.  Plaintiffs also attached a sample notice for Miami to inform athletes affected by the subpoena that Miami would be

---

[7] *See, e.g.*, *id.* (discussing NIL deals entered into by Miami women's-volleyball and track-and-field athletes).

[8] *Miami Athletics Launches Ignite Name, Image & Likeness Program*, MIAMIHURRICANES.COM (June 30, 2021), https://miamihurricanes.com/news/2021/06/30/miami-athletics-launches-ignite-name-image-likeness-program-2/.

[9] *See* Blinder, *supra* n.1.

[10] *Miami, Adidas strike 12-year deal*, ESPN (Jan. 8, 2015), https://www.espn.com/college-sports/story/_/id/12135717/miami-hurricanes-adidas-strike-12-year-merchandise-marketing-agreement.

producing certain information in accordance with the Family Educational Rights and Privacy Act.
20 U.S.C. § 1232g; 34 CFR Part 99 ("FERPA").  *See* Ex. 2 at Attachment C.

On October 4, 2021, Miami provided standard-form objections, including general
objections that the subpoena was overbroad in scope; that much of the responsive information
would be nonpublic, sensitive, confidential, proprietary, and/or trade secrets; that the requests
sought information protected by federal and state privacy laws; and that the method of and time
for compliance imposed an undue burden.  *See* Objections of Non-Party, University of Miami, to
Subpoena Issued by Plaintiffs (attached as Ex. 3).  During telephonic meet-and-confers on October
7 and November 22, and through follow-up email correspondence, Plaintiffs substantially
narrowed their request—and the burden on Miami—to the four categories sought here:
(1) documents reflecting Miami athletes' NIL agreements, or data of the same; (2) Squad Lists;
(3) financial aid summary reports; and (4) commercial agreements entered into by Miami's
athletics department.  Plaintiffs explained to Miami that the requested materials are critical to
properly defining Plaintiffs' classes, proving antitrust injury, and developing reliable damages
models.  Miami refused to engage in a substantive conversation and on December 15, 2021, stated
that it would continue to stand on its original objections and not produce *any* documents.  *See*
Email from M. Lines to A. Dale & J. Wexler (Dec. 15, 2021) (attached as Ex. 4).

## II.    ARGUMENT

The Court should order Miami to produce the requested materials.  Their production is
proportional to the needs of the underlying litigation, as the documents are highly relevant to the
claims and defenses, the requests are tailored to minimize any burden on Miami, and the
information is unavailable from any other source.

### A.    Legal Standard

"The Federal Rules of Civil Procedure favor an expansive scope of discovery," including
with respect to a Rule 45 nonparty subpoena. *N. Am. Transp. Servs., LLC v. Ryder Truck Rental,
Inc.*, 2021 WL 3290627, at *2 (S.D. Fla. Aug. 2, 2021).  Indeed, a Rule 45 subpoena "has the same
scope of discovery allowed under Rules 26(b) and 34," which allow "discovery regarding any

non-privileged matter that is relevant . . . and proportional to the needs of the case[.]" *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).  Proportionality contemplates the importance of the issues, the amount in controversy, the parties' resources, the importance of the discovery, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(1); *see also, e.g.*, *ADP, LLC v. Ultimate Software Grp., Inc.*, 2017 WL 7794274, at *2 (S.D. Fla. July 26, 2017) (ordering discovery where "it is not unduly burdensome to ask a [nonparty] to search certain employees' emails on a specific subject matter"); *Sullivan v. Personalized Media Commc'ns, LLC*, 2016 WL 5109994, at *2–3 (N.D. Cal. Sept. 21, 2016).

A party seeking nonparty discovery "must take reasonable steps to avoid imposing undue burden or expense." *Ryder*, 2021 WL 3290627, at *2 (quoting Fed. R. Civ. P. 45).  While status as a nonparty may be considered in determining whether the burden imposed by the subpoena is undue, it is not dispositive.  *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 2021 WL 4891300, at *2–3 (S.D. Fla. Oct. 19, 2021) (rejecting argument that "information sought in Plaintiffs' subpoenas is not relevant to the underlying case because [respondent] is not a party to that case").  A "party objecting to discovery based on undue burden bears the burden of persuasion on that objection."  *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 5585137, at *3 (S.D. Fla. Sept. 16, 2020); *accord Ryder*, 2021 WL 3290627, at *2.

**B.    The Subpoenaed Documents Are Relevant and Necessary to the Litigation**

**i.    NIL Agreements or Data**

In response to subpoena Request No. 4, Plaintiffs seek, for the period from July 1, 2021, through the end of the 2021–2022 academic year, NIL agreements that athletes disclosed to Miami in accordance with state law and Miami policy,[11] or data about those agreements.[12]

---

[11] Miami's NIL policy requires that "[a]ll NIL deals must be disclosed by the student-athlete via Opendorse." *NIL Policies*, MIAMI HURRICANES, https://miamihurricanes.com/nil-booster-policy.

[12] Plaintiffs offered to substantially narrow the original subpoena request to this limited category of documents after Miami's objections regarding breadth and burden. *Compare* Ex. 2, Subpoena Request 4, *with* Email from A. Dale to M. Lines (Dec. 9, 2021) (attached as Ex. 5, at 1–2).

Miami's objections are as follows:

> (i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is overly broad in time frame; (iv) the request is unduly burdensome; (v) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (vi) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (vii) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification requirements under FERPA and (c) the burdensomeness of the request; and (viii) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 6; Ex. 4.

This data regarding student-athletes' NIL agreements goes to the heart of the underlying litigation, as Plaintiffs allege that the NCAA's national rules that limit—and until July 1, entirely prohibited—athletes' abilities to enter into NIL agreements violate the antitrust laws. These agreements (or data therefrom) show that the NCAA's rules suppress—and until July 1, entirely eliminated—a robust market for college athletes' NIL rights. There can be no more-pertinent evidence in an antitrust lawsuit than a natural experiment of the market without some of the challenged restraints. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1250, 1258 (9th Cir. 2020) (affirming district court injunction against certain NCAA compensation limits based, in part, on "two natural experiments" of athletes' receipt of compensation above NCAA limits), *aff'd*, 141 S. Ct. 2141 (2021). The NIL agreements Plaintiffs seek embody that natural experiment, and for that reason alone, they should be produced.

Separately, details about the NIL agreements are essential for Plaintiffs to develop damages models that will reliably predict which athletes, or categories of athletes, would have entered into such agreements in the past if the challenged NCAA rules were not in effect, and how much the athletes would have received. According to public reports, a substantial number of Miami athletes have entered into lucrative NIL agreements. For example, every member of Miami's football and

men's basketball teams was offered an NIL agreement worth thousands of dollars.[13]  Miami's female athletes have also entered into high-value NIL agreements.[14]  And Miami itself has boasted about the NIL earning opportunities available to its athletes.  On June 30, when Miami announced its "Ignite" program—in partnership with marketing company Opendorse[15]—to assist athletes in building their NIL brands, Miami's head football coach said:

> You have the unique opportunity as a Miami Hurricane to get a great education, compete for championships and build your brand in the heart of one of the world's most recognized and dynamic cities.  We want our student-athletes to maximize their opportunities on NIL and Opendorse is providing significant resources to help us accelerate that process.[16]

Plaintiffs seek details about Miami athletes' NIL agreements that are specific to Miami and maintained by Miami in the normal course of business.  Per Miami policy, athletes are required to disclose their NIL-agreement details to Miami through the Opendorse platform.[17]  This information is not maintained by any Defendant.  Nor is it available publicly.  The burden that Plaintiffs would face in independently collecting each agreement entered by a Miami athlete is substantial.  By contrast, there would be little to no burden on Miami to produce the requested information, as it can be easily downloaded from the Opendorse platform.  Miami is thus the *only* reasonable custodian of this essential information.

Although Miami has declined to engage in material discussions to elaborate on its boilerplate objections, none has merit.  Plaintiffs have substantially narrowed the documents they seek to only the NIL agreements or data maintained in the Opendorse platform detailing those

---

[13] Geisinger, *supra* n.2; Kaufman, *supra* n.2.

[14] Chen, *supra* n.6.

[15] Opendorse is one of several companies providing technology that universities may provide to their student-athletes to assist them in tracking NIL opportunities and agreements.  *See* What We Do, OPENDORSE, *available at* https://opendorse.com/about.

[16] @CanesFootball, TWITTER (June 30, 2021, 7:15 PM), https://twitter.com/canesfootball/status/1410376601439776768.

[17] *See supra* n.11.

agreements.[18]  This is a limited universe of documents, as NIL deals have only been permitted under NCAA rules since July 1, 2021.  To the extent Miami has confidentiality concerns, there is a comprehensive protective order in the underlying litigation, which was attached to the subpoena and has effectively protected the most highly confidential commercial agreements in all of college sports.  *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, Case No. 4:14-md-2541-CW, Dkt. Nos. 1111–13 (retaining under seal nonpublic portions of multibillion-dollar NCAA multimedia agreement and highly valuable sponsorship licensing agreements).

Similarly, while FERPA prohibits the everyday disclosure of students' personal information, such information may be produced in response to a lawful subpoena where the affected students are notified in advance and provided an opportunity to object to disclosure.  20 U.S.C. § 1232g(b)(2)(B); 34 CFR § 99.31(a)(9)(ii).[19]  The burden of issuing FERPA notices regarding this request is minimal.  Miami undoubtedly maintains accessible contact information to allow it to communicate easily with its students.  Miami must provide notice only to those athletes who have received and reported compensation for their NILs since July 1, 2021.

In short, NIL agreements are direct evidence of the effect of the challenged NCAA rules.  Accordingly, because of Miami's unique possession of the NIL-deal information for its athletes and the minimal burden required to produce that information, the request is proportionate to the needs of the underlying litigation and should be compelled.  *See Ryder*, 2021 WL 3290627, at *2 (compelling nonparty to produce "discrete set" of information); *TIC Park Ctr. 9, LLC v. Cabot*, 2017 WL 3099317, at *3 (S.D. Fla. Apr. 12, 2017) (nonparty's "reliance on barebones claims of hardship is insufficient to meet the requirements of Rule 45").

---

[18] *See supra* n.12.

[19] To Plaintiffs' knowledge, the issue of whether commercial agreements between athletes and third parties are subject to FERPA protections has not been adjudicated.  In any event, Plaintiffs do not object to Miami's issuing FERPA notices and providing athletes an opportunity to object if Miami believes it necessary.  Plaintiffs intend to honor any athlete objections to disclosure.

### ii.  Squad Lists

In response to subpoena Request No. 1, Plaintiffs seek, for the proposed class period from January 1, 2016, through the 2021–2022 academic school year, all "squad list forms" and "supplementary forms," as defined in the 2020–2021 NCAA Division I Manual, Bylaw 15.5.11.2,[20] prepared by Miami for its D-I sports teams ("Squad Lists"). Ex. 2, at 6. NCAA rules require schools, including Miami, to prepare and maintain Squad Lists for each of their D-I athletic teams and to make them "available for examination upon request by an authorized representative of another member institution, the NCAA, and, if the institution is a member of a conference, an authorized representative of the conference." NCAA Bylaw 15.5.11.2 et seq. These Squad Lists detail each team member's name and NCAA eligibility data, including his or her class year and the amount of athletic and total financial aid received. *Id.* In other words, a Squad List contains a compilation of material information about the student-athlete team members.

Miami objected to producing Squad Lists on the following grounds:

(i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is overly broad in time frame; (iv) the request is unduly burdensome; (v) the request purports to require the creation of documents or the providing of "information"; (vi) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (vii) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (viii) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification requirements under FERPA and (c) the burdensomeness of the request.

Ex. 3, at 3–4.

Plaintiffs believe that Miami stores its Squad Lists in an easily accessible central repository, but Plaintiffs offered to discuss particular burden concerns associated with producing them. Yet Miami has refused to meaningfully engage. *See* Ex. 4, at 1–3. Because Squad Lists

---

[20] *See* 2020–2021 NCAA Division I Manual, *available at* https://www.ncaapublications.com/p-4605-2020-2021-ncaa-division-i-manual.aspx.

are readily available for production and highly relevant to the underlying antitrust litigation, Miami should be compelled to undertake the minimal burden required to produce them.

The compiled information maintained in Squad Lists is critical data for at least three reasons: Plaintiffs will use the data to (1) develop their damages model; (2) address class definition issues; and (3) demonstrate that all class members were harmed.

In support of their damages claims, Plaintiffs' experts will develop economic-regression models to predict which athletes would have received NIL compensation in the but-for world. Plaintiffs expect to match financial-aid and player-identification data in Squad Lists to real-world attributes (which Plaintiffs will independently collect)—such as on-field performance, social media presence, pre-enrollment notoriety, and local and national popularity—to create "player profiles" that may serve as inputs into the regression model.  For the 2021–2022 natural-experiment year, this "player profile" will also include the NIL-agreement data discussed above. Courts regularly compel third parties to produce materials relevant to a party's damages claims. *See, e.g.*, *Ryder*, 2021 WL 3290627, at *2, *4; *Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*, 2010 WL 9871643, at *1, *3, *6 (S.D. Fla. Jan. 26, 2010) (requiring nonparty to produce "categories of documents relating . . . to Plaintiff's claim for hurricane damage"); *Dig. Shape Techs., Inc. v. Glassdoor, Inc.*, 2016 WL 5930275, at *2, *5 (N.D. Cal. Oct. 12, 2016) (compelling nonparty to produce "documents responsive to [certain] requests to support [plaintiffs'] damages claim" and "relevant to the question of damages").

Plaintiffs will also use Squad List data to respond to Defendants' "substitution effect" argument—the theory that in the but-for world, where the challenged NIL rules did not exist, more-talented athletes would attend college in the first place, or stay in school longer, which, in turn, would displace less talented athletes from the class.  This argument contends that less-talented athletes benefit from the challenged NIL restraints and thus cannot be part of the proposed classes. Plaintiffs will analyze financial-aid and roster information in Squad Lists to address this argument and the class definitions to support their position that no class member would have been displaced in the but-for world, even under Defendants' substitution-effect theory.

The substitution-effect argument is not hypothetical—Defendants already advanced it in their Answers.  For example, the NCAA's Eleventh Additional Defense states, "The claims of the Plaintiffs and alleged members of the putative class and sub-classes are barred, in whole or in part, *to the extent that they were not injured by, or have been enriched by, the rules being challenged here . . . .*"  Def. NCAA's Answer, ECF No. 170, at 51 (emphasis added) (attached as Ex. 6).  Further, plaintiffs in prior antitrust litigations against the NCAA and conference Defendants have addressed the same arguments, illustrating the relevance of the Squad Lists.

In the *O'Bannon* antitrust litigation challenging the NCAA's prohibition on college athletes' abilities to "enter[] into group licensing arrangements with videogame developers and broadcasters for the use of their names, likenesses, and images," the court declined to certify certain of the proposed plaintiffs' classes based on the NCAA's substitution-effect arguments.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *8–9 (N.D. Cal. Nov. 8, 2013) (observing that a "barrier to manageability here is the so-called 'substitution effect'").  In the more recent *Alston* litigation, plaintiffs rebutted a similar argument through an expert analysis of Squad List data showing the distribution of financial aid among student-athletes.  *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 542–43 (N.D. Cal. 2015) (crediting plaintiffs' experts' analysis of Squad Lists and financial-aid data to reject substitution-effects arguments).  Critically, the *Alston* plaintiffs' ability to analyze Squad Lists stands in stark contrast to the *O'Bannon* class-certification denial when the plaintiffs did not obtain that data and could not provide the court with more-extensive analyses of the proposed classes, as Plaintiffs anticipate they will do here.[21]  Accordingly, Squad Lists are highly relevant and should be produced for that reason alone.

---

[21] The proposed classes in *O'Bannon* and *Alston* share certain attributes with the proposed classes in the underlying litigation but are also distinguishable in several ways—an issue that may be further considered by the Northern District of California during the class-certification process. This action is also being prosecuted following the Supreme Court's landmark decision in *Alston*, which made clear that compensation restraints imposed by the NCAA and its members are fully subject to antitrust scrutiny, which also may bear on the class-certification and damages issues here.  *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2156–57 (2021).

Although Miami has largely declined to engage in substantive discussions during the parties' meet-and-confers, Plaintiffs understand that the burden of issuing FERPA notices is Miami's primary objection to producing Squad Lists. As noted above, FERPA permits the disclosure of otherwise-protected information in response to a lawful subpoena where the affected students are notified in advance and provided an opportunity to object.[22] Plaintiffs believe that, like other universities, Miami maintains an accessible repository of current and former students' contact information and, like other universities, Miami routinely sends mass mailings to far more current and former students than those impacted by the subpoena. It is thus no surprise that in response to similar subpoenas, dozens of colleges and universities—including institutions in Florida—have issued FERPA notices and produced, or will soon produce, Squad Lists.

In sum, compelling Miami to produce Squad Lists is proportional to the needs of the underlying case. They are created and maintained by Miami in the normal course of business, are highly relevant to the underlying litigation, and would impose minimal burden on the well-resourced Miami Athletics Department.

### iii.    Financial Aid Summary Reports

In response to subpoena Request No. 2, Plaintiffs ask that the Court order Miami to produce (or consent to the NCAA producing), for the period from January 1, 2016, through the 2021–2022 academic year, "Student-Athlete Financial Aid Summary Reports" from the NCAA's Compliance Assistant database, which Miami submits annually. These reports contain additional details on team-member financial aid.

Although Plaintiffs offered this substantially narrowed request,[23] Miami continues to stand on its original objections:

---

[22] Plaintiffs do not dispute that FERPA protects some data in Squad Lists, and Plaintiffs will not pursue such information about any athlete who objects through the FERPA process.

[23] *Compare* Ex. 2, Subpoena Request 2, *with* Ex. 4, at 1–3.

(i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is overly broad in time frame; (iv) the request is unduly burdensome; (v) the request purports to require the creation of documents or the providing of "information"; (vi) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (vii) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (viii) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification requirements under FERPA and (c) the burdensomeness of the request; and (ix) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 4–5.

This financial-aid data—which is complementary to, and more comprehensive than, the information in Squad Lists—provides unique insight into the status of the current and former athletes.  As described above, Plaintiffs will use this information in tandem with Squad List information to build and test their damages models, address the scope of the class definitions, and address Defendants' substitution-effect argument.  There is no additional burden to Miami in producing this data, as athletes can be notified through the same FERPA notice issued by Miami with respect to Plaintiffs' prior requests, and upon completion of the FERPA process, Miami can simply authorize the NCAA to make the production.

### iv.   Athletics Commercial Agreements

Plaintiffs seek to compel Miami to produce, for the period from January 1, 2016, through the present, (1) any media, sponsorship, licensing, or other revenue-generating commercial agreements entered into by Miami relating to its D-I sports, including apparel and equipment contracts, sponsorship contracts, multimedia-rights contracts, and contracts licensing the broadcast of Miami's D-I athletics events; and (2) Miami's agreement or agreements with Opendorse.[24]

---

[24] In an effort to avoid the need for court intervention, Plaintiffs offered to drop this request entirely if Miami agreed to produce Squad Lists, Financial Aid Summary Reports, and documents reflecting NIL agreements. *See* Ex. 5, at 1.  Miami declined to substantively respond to the offer, Ex. 4, at 1, and Plaintiffs therefore seek production of these highly relevant commercial agreements.

Plaintiffs are also amenable to the Court's setting a materiality threshold, allowing Miami to withhold any revenue-generating commercial agreements valued at less than, e.g., $10,000.

> Miami objected to this Request on the following grounds:
> (i) the request is overly broad in scope; (ii) the request is unduly burdensome; (iii) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; and (iv) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 8.

Miami's commercial agreements are directly relevant to the claims and the defenses in the underlying litigation.  Indeed, they illustrate the monopsony profits that NCAA schools derive, at least in part, from the use of athletes' NILs.  For example, under Miami's reported $100 million deal with Adidas, Miami requires its athletes to wear Adidas apparel during all competitions, and Adidas reaps the benefits of associating its products with Miami's athletes.  The athletes, however, receive no compensation from the agreement.  These agreements also reflect the value that Miami's commercial partners place on athletes' NIL rights—information that goes to the heart of Plaintiffs' claims.  And according to Plaintiffs' review of similar agreements, Miami's commercial agreements are likely to explicitly or implicitly grant Miami's commercial partners the rights to use Miami athletes' NILs.  Finally, Defendants have repeatedly asserted that a principal justification for their compensation-related rules (including the challenged NIL rules) is that college sports are distinct from professional sports and that fans consume college sports because of their "amateur" nature.  Plaintiffs are entitled to test that claim by reviewing the terms of the commercial agreements to determine how much (if at all) those documents show any connection between consumer interest in Miami D-I athletics and players' not receiving NIL compensation, rather than loyalty and interest in Miami for other reasons.

These commercial agreements are unique to Miami and could not readily be obtained from another party.  It would be substantially more burdensome for Plaintiffs to identify each of Miami's commercial partners and seek production of the agreements from them piecemeal while Miami is likely to have them segregated in a central location.  Nor is the targeted information available

publicly. And to address any confidentiality concerns associated with producing these agreements, Plaintiffs provided Miami with the operative protective orders in the underlying litigation. As noted above, these orders have effectively protected from disclosure the most-lucrative and highly confidential commercial agreements in all of college sports, and similar confidential agreements—many worth billions of dollars—have been produced without issue in this litigation.

In short, Miami's commercial agreements are highly relevant to the underlying litigation, including as evidence of precisely how Miami itself generates monopsony profits as a result of the challenged NCAA rules. The agreements will be adequately concealed from public disclosure and are likely maintained by Miami in a central repository in the normal course of its business. The minimal burden required for Miami to collect and produce them is therefore proportionate to the needs of the underlying litigation.

## III.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER PLAINTIFFS' MOTION TO THE NORTHERN DISTRICT OF CALIFORNIA

Finally, in the alternative, this Motion should be transferred to the Northern District of California for adjudication because it arises from complex litigation pending there. *See In re Coll. Athlete NIL Litig.*, Case No. 4:20-cv-03919-CW (N.D. Cal.). "When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court . . . if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). The phrase "exceptional circumstances" has been broadly interpreted. *See* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment). Courts weighing transfer under Rule 45(f) "should look to a variety of factors to determine if the judge from the issuing court is in a better position to rule on the motion due to her familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation." *Hoog v. PetroQuest, LLC*, 338 F.R.D. 515, 517–19 (S.D. Fla. 2021) (citation omitted). Those "factors include the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." *Id.* (citation omitted); *see also Walgreen Co. v. Wyeth, Inc.*, 2019 WL 2406338, at *2 (S.D. Fla. Mar. 26, 2019).

16

Given that the Northern District of California already has the best understanding of the issues involved in this complex class action (issues that directly implicate the requests at the heart of Plaintiffs' Motion), the importance of avoiding inconsistent rulings, and minimal (if any) burden on Miami to litigate this matter in the Northern District of California, exceptional circumstances exist, and this Court should transfer Plaintiffs' Motion to that district.

    **A.    Plaintiffs' Motion Should Be Adjudicated in the Northern District of California, Which Has the Best Understanding of the Complex Issues Involved in This Action**

Courts should grant motions to transfer where the litigation is complex and doing so is necessary "to avoid disrupting the issuing court's management of the underlying litigation." *See* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment). Here, the Northern District of California is in the best position to adjudicate the objections raised by Miami—which, as described above, relate to the merits of the underlying litigation—and provide consistent rulings on similar discovery disputes without disrupting the underlying case. *See Walgreen*, 2019 WL 2406338, at *2 (noting that the transferor court's "resolution of debates about relevance . . . [and] matters entrusted to the substantial discretion of trial courts [] would run the risk of being inconsistent with the [issuing court's] management of the voluminous discovery in this lawsuit"); *Cont'l Auto. Sys. U.S., Inc. v. Omron Auto. Elecs., Inc.*, 2014 WL 2808984, at *2 (N.D. Ill. June 20, 2014) (transferring motion to compel nonparty document production to avoid "disrupting [the issuing] court's management of the underlying litigation" where relevance objections to a subpoena required the court to "delv[e] into the merits of the litigation"). The issuing court remains the best forum for resolution of such questions even where it "has not yet ruled on any discovery disputes." *In re Braden*, 344 F. Supp. 3d 83, 94 n.9 (D.D.C. 2018); *accord Exist, Inc. v. Shoreline Wear, Inc.*, 2015 WL 13694080, at *3 (S.D. Fla. Oct. 16, 2015) (finding exceptional circumstances given the "potential for disruption in the underlying litigation caused by potentially conflicting rulings").

The Northern District of California—specifically, Judge Claudia Wilken and Magistrate Judge Nathanael Cousins, who are presiding over the underlying litigation—is particularly familiar

with the materials that lie at the heart of Plaintiffs' Motion to Compel. Indeed, Judges Wilken and Cousins presided over two prior antitrust lawsuits concerning NCAA compensation limits. Those experiences, including Judge Wilken's intimate familiarity with the substitution-effect argument raised—and decided differently—in each case, demonstrate that the Northern District of California has "developed a deep and rigorous understanding of the issues implicated in [this] dispute," making transfer appropriate. *Global Music Rights, LLC v. Saga Commc'ns, Inc.*, 2021 WL 4751184, at \*3 (N.D. Ohio Oct. 8, 2021) (internal citations and quotations omitted); *accord Hoog*, 338 F.R.D. at 517–18 (presiding judge is "better positioned to determine issues of relevancy . . . and other related issues in light of her close involvement in the [underlying] litigation and her knowledge of the issues at play in the complex case before her" where the underlying litigation had "a complex history and is related to several cases that have been filed in the [presiding district] involving highly specialized . . . class action claims").

### B.    The Northern District of California Should Rule on Similar Motions

Exceptional circumstances requiring transfer are also present where, as here, "the issuing court is already coordinating discovery in the underlying multidistrict action [and] that court has already issued subpoenas to entities in various other states." *In re Niaspan Antitrust Litig.*, 2015 WL 3407543, at \*1 (D. Md. May 26, 2015); *see also* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment) ("[T]ransfer may be warranted . . . [where] the same issues are likely to arise in discovery in many districts."); *The Dispatch Printing Co. v. Zuckerman*, 2016 WL 335753, at \*3–4 (S.D. Fla. Jan. 27, 2016) (granting transfer given the "demonstrable risk of inconsistent discovery rulings" where plaintiff "will continue to subpoena th[e] same type of information from [nonparties in] various judicial districts").

Plaintiffs have served more than 100 subpoenas on colleges and universities in dozens of judicial districts. While Plaintiffs have reached agreements with most of these NCAA member schools, similar motions to compel and transfer are likely to become necessary in other judicial districts. Transfer will therefore preserve the Northern District of California's authority over its

proceedings and promote judicial economy by ensuring consistent subpoena compliance. *See VirnetX, Inc. v. Apple Inc.*, 2013 WL 12108440, at *3 (S.D. Fla. Sept. 26, 2013), *report and recommendation adopted*, 2013 WL 12108441 (S.D. Fla. Nov. 18, 2013) (transfer appropriate where "virtually identical subpoenas . . . and motions to transfer are pending in three different districts" and "denying transfer in this District while the other districts with pending motions may or may not do the same would only add to the confusion and complexity of the underlying litigation"); *Google, Inc. v. Digital Citizens All.*, 2015 WL 4930979, at *3 (D.D.C. July 31, 2015) (granting motion to transfer because similar motions to compel and transfer pending in multiple jurisdictions "create[d] potential for inconsistent rulings" and "weigh[ed] in favor of a single judicial officer deciding all . . . disputes").

### C.    Transferring This Motion Would Impose No Burden on Miami

Transfer will impose minimal, if any, burden on Miami.  Even if counsel for Miami were required to appear in person for any oral argument (which is uncertain given the prevalence of remote hearings occurring across the country in light of the COVID-19 pandemic), transfer would still be appropriate because "the fact that the subpoenaed party and its counsel are [] located [outside] the issuing district" does not "weigh decisively against transfer to the issuing court in the face of other exceptional circumstances favoring transfer." *Chem-Aqua, Inc. v. Nalco Co.*, 2014 WL 2645999, at *4 (N.D. Tex. June 13, 2014).  Nor will Miami be required to incur any additional expense to litigate in the Northern District of California.  *See Exist, Inc. v. Shoreline Wear, Inc.*, 2015 WL 13694080, at *3 (S.D. Fla. Oct. 16, 2015) (minimal burden associated with transfer to California in part because "the Advisory Committee notes to Rule 45 encourage the court to permit telephonic participation after transfer to minimize travel costs to non-parties").  Indeed, "[t]ransferring a *motion* to the jurisdiction where the underlying litigation is pending that will require few, if any, modifications of the written submissions, does not rise to the level of unfair prejudice.  Therefore, the cost that may be incurred to litigate a motion in the [issuing district] . . . is *de minimis*." *Wultz v. Bank of China, Ltd.*, 304 F.R.D. 38, 45 (D.D.C. 2014) (emphasis in original); *accord Dispatch Printing*, 2016 WL 335753, at *4 (transferring

motion after finding transfer would not "impose an undue burden that would have the effect of canceling out the exceptional circumstances weighing heavily in favor of transfer").

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court compel Miami's compliance with the subpoena or, in the alternative, grant Plaintiffs' Motion to Transfer.

*  *  *  *  *

**CERTIFICATE OF GOOD FAITH CONFERENCE; CONFERRED BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION**

In accordance with Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or nonparties who may be affected by the relief sought in this Motion in a good-faith effort to resolve the issues, but has been unable to do so.

Respectfully submitted,

By:  s/ *Cristina I. Calvar*
Cristina I. Calvar (Fla. Bar No. 114201)
Adam I. Dale (*pro hac vice* forthcoming)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
ccalvar@winston.com
aidale@wisnton.com

Jeanifer E. Parsigian (*pro hac vice*
forthcoming)
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-14000
jparsigian@winston.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2022, a true and correct copy of Plaintiffs' Motion to Compel Compliance with a Rule 45 Subpoena or, in the Alternative, to Transfer the Motion, with Exhibits 1 – 6 and Civil Cover Sheet thereto, was served via e-mail and United States Postal Service first-class mail on:

Eric D. Isicoff
Matthew L. Lines
ISICOFF RAGATZ
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Telephone: (305) 373-3232
Facsimile: (305) 373-3233
E-mail: isicoff@irlaw.com
E-mail: lines@irlaw.com

*Attorneys for nonparty*
*University of Miami*

*/s/ Cristina I. Calvar*
Christina I. Calvar